# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

SHANE LEE LAGRANGE,

      Defendant.

No. 18-CR-90-CJW

**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS**

---

## TABLE OF CONTENTS

Page

I.    *INTRODUCTION* ..................................................................................... 3

II.   *FINDINGS OF FACT* ............................................................................ 3

III.  *ANALYSIS* ........................................................................................... 10

    A.    *The Parties' arguments* ......................................................... 10

    B.    *Messer and Liddle had reasonable suspicion that Defendant was likely involved in criminal activity on December 29, 2017* ................ 11

         i.    *The officers' reliance on the memo was reasonable* ................... 12

         ii.   *Messer's reliance on his past experiences with Defendant and his belief that Defendant had an outstanding warrant were reasonable* ................................................................................ 15

         iii.  *Messer and Liddle had reasonable suspicion that Defendant was likely involved in criminal activity* .................................. 17

**C.** ***The items seized in the searches of Defendant and the Grand Prix should not be suppressed*** .................................................... 18

    **i.** ***Defendant was merely detained before his arrest*** ............... 18

    **ii.** ***The items seized from Defendant's person should not be suppressed*** ...................................................................... 20

    **iii.** ***The items seized from the search of the Grand Prix should not be suppressed*** ..................................................... 20

        **a.** ***The search of the Grand Prix was a valid inventory search*** .......................................................... 21

        **b.** ***Defendant had not abandoned the Grand Prix or property in it*** ................................................................. 22

        **c.** ***The evidence in the Grand Prix would not have been inevitably discovered*** ......................................... 24

        **d.** ***Items seized from the search of the Grand Prix need not be suppressed*** ................................................. 25

**D.** ***Defendant's statements should not be suppressed*** ......................... 25

    **i.** ***Defendant's December 29, 2017 confession should not be suppressed*** ...................................................................... 25

    **ii.** ***Defendant's June 2018 statements should not be suppressed*** .... 26

**IV.** ***CONCLUSION*** ................................................................................. 29

# I. *INTRODUCTION*

The matter now before me is Defendant's Motion to Suppress Evidence. (Doc. 7.) On September 11, 2018, the Grand Jury charged Defendant with Possession with Intent to Distribute a Controlled Substance, Possession of a Firearm during a Drug Trafficking Crime, and Possession of a Firearm by a Felon. (Doc. 2.) The charges arose from an incident that occurred on December 29, 2017.

The Honorable Charles J. Williams, United States District Court Judge, referred this motion to me for a Report and Recommendation. On November 5, 2018, I held an evidentiary hearing on Defendant's motion. The Government called the following witnesses:

- Cedar Rapids, Iowa Police Officer Matt Messer;
- Cedar Rapids, Iowa Police Officer Lucas Liddle; and
- Cedar Rapids, Iowa Police Officer John O'Brien.

Defendant called no witnesses.

For the following reasons, I respectfully recommend that the Court **deny Defendant's Motion to Suppress.**

## II. *FINDINGS OF FACT*

On December 29, 2017, Cedar Rapids Police Department ("CRPD") Investigating Officer Randal Reck issued an intelligence memorandum email ("the memo") with the subject line, "Burglary/ Wanted Subject/ Officer Safety Information." (Doc. 10-1.) The memo stated the following:

> An informant advised DOT Investigator Jason Nusbaum that Shane Lagrange . . . is in possession of a pink Glock with camo grips. The CI stated he saw him in possession of the gun on 12/27/2017. Lagrange has been staying at different hotels on 33rd Ave SW. Use caution if you make contact. . . . Lagrange is a meth user as well.

(*Id*.) The memo contained two photographs of Defendant. The memo contained no

indication of the veracity of the informant's claims, Investigator Nusbaum's previous dealings with the informant, or corroboration of the informant's claims. CRPD Officers Matt Messer and Lucas Liddle read the memo before beginning their shift at 4:00 p.m. that day. Messer had spoken to Nusbaum on the phone before, but never about drug crimes, gun crimes, Nusbaum's informants, or Defendant. Liddle did not know Nusbaum.

Messer was familiar with Defendant because he had personally encountered Defendant "a handful" of times in the past, and arrested Defendant once. (Matt Messer Nov. 5, 2018 Hr'g Test.) Messer knew Defendant had a history of methamphetamine use from Defendant's previous admissions and Defendant's associations. Messer also thought that Defendant had been in prison because there was a gap in Defendant's history when Messer checked Defendant's name against the CRPD in-house record system prior to beginning his shift. Based on the heading of the memo, "Wanted Subject," Messer testified he mistakenly thought Defendant had an outstanding warrant. (*Id.*) Liddle was not familiar with Defendant before the events of December 29.

Messer and Liddle are both members of the Cedar Rapids Police Community Action Team ("PCAT"), whose members are tasked with building relationships in high-crime communities. PCAT officers spend much of their time addressing gun violence in high-crime areas of the city and are familiar with the area mentioned in the memo because the group of hotels is in a high-crime area. In fact, Defendant, himself, claims he had been assaulted and robbed in that area three times in the weeks prior to the incident that is the subject of this motion.

After receiving the memo, Messer and Liddle began their shift by patrolling the hotel area so they could develop information related to Defendant. It is common for the officers to drive through the hotel parking lots in this high-crime area and run license plate checks on cars parked there and then "loop" back through to see if there

have been any changes. (Lucas Liddle Nov. 5, 2018 Hr'g Test.)  Messer drove, and Liddle ran the squad car's computer. When the officers drove through the Hometown Inn and Suites ("Hometown") parking lot, a white Grand Prix caught their attention because it was parked and running on that very cold and snowy evening when most people would get inside as quickly as possible. Snow was building up on the vehicle and the windows were fogged over, but at least one person was inside the Grand Prix.  The officers ran the license plate and discovered the vehicle belonged to someone from a small town in Iowa.  There was no criminal activity associated with the vehicle, so the officers drove on.  Although Messer could not identify the driver of the Grand Prix, Messer could see the driver "staring intently at the officers" through the Grand Prix's side mirror.  (Messer Hr'g Test.)

Fifteen or twenty minutes later, Messer and Liddle returned to the Hometown parking lot.  As they were pulling into the lot, they saw the Grand Prix driving toward them.  The Grand Prix stopped in the middle of the parking lot when the driver saw the squad car.  Both officers found this behavior unusual, but Messer continued driving into the lot and passed right next to the Grand Prix.  Messer noticed that the driver was driving with one hand up on the steering wheel while trying to hide his face behind his other arm and by turning his head down and toward the center console.  (*Id.*)  Messer found this behavior unusual because in his experience most people drive with their hands at "10 and 2" or "12" and another spot on the car's steering wheel.  (*Id.*)  In spite of what he believed was an attempt to hide, Messer identified the driver as Defendant and shared this information with Liddle.  Liddle entered Defendant's name in the computer to pull up Defendant's criminal record, including any outstanding warrants and citations.

At that moment, Defendant accelerated out of the parking lot while Messer and Liddle were making a U-turn at the other end of the lot.  Messer testified that Defendant's

driver's license had been suspended every time Messer had encountered him. Messer also knew that Defendant had once been arrested for having a suspended license. Messer therefore suspected Defendant was driving on a suspended driver's license. (*Id.*) Based on this suspicion, and Messer's mistaken belief that Defendant had an outstanding warrant, the officers followed Defendant. Messer did not turn on the squad car's flashing lights or siren.

Defendant pulled into a parking space in a nearby Burger King parking lot, put the car in park, exited the vehicle (while it was still running), and allowed the car door to close by itself. Messer and Liddle pulled into a space behind Defendant but did not box Defendant in. Messer testified that he and Liddle intended to conduct a consensual stop because at that point nothing had come back from the search on their squad computer. (*Id.*) Defendant was not facing the officers as he got out of the car but immediately turned to face them when Messer called out, "Hey, Shane, come here!" (Def. Ex. A at 5:31:10.)[1] When Defendant turned around, he appeared to have his hand near his waistband, which Messer knew from his training and experience is a place people hide weapons.

Messer told Defendant to put his hands where officers could see them, and Defendant complied. Liddle said, "You're just gonna be detained right now," and immediately put Defendant's hands behind his back and handcuffed him. (Def. Ex. C at 5:31:26.) Liddle told Defendant he was not under arrest but was being handcuffed because the officers did not want him to run. (Def. Ex. A at 5:31:31.) When Defendant asked why he was being detained when he had done nothing wrong,

---

[1] The three cameras on scene, one in the front of the squad car (Def. Ex. A), one on Messer's body (Def. Ex. B), and one on Liddle's body (Def. Ex. C), do not seem to be perfectly synced. Therefore, the times do not line up perfectly. However, the above narrative relates the order of events as accurately as I can discern them based on watching the video and listening to the officers' testimony.

Messer said Defendant had some warrant paperwork to take of. (Def. Ex. B at 5:32:16-17.) Defendant denied having any outstanding warrants. (*Id.* at 5:32:18-19.) Messer then queried, "You don't have a license, right? I've talked to you enough to know you don't have a driver's license." (*Id.* at 5:33:50-52.) Defendant admitted his driver's license was suspended, but said he was getting it back. (*Id.* at 5:33:23-27.) Liddle asked if Defendant had any weapons, and Defendant stated that he had a knife. Liddle conducted a pat search of Defendant and did not find any contraband. Liddle testified that handcuffing and pat searching detained subjects suspected of carrying weapons is part of his training. (Liddle Hr'g Test.) When Liddle began checking Defendant's pockets, Messer told him to "sit tight" and Liddle stopped searching. (Def. Ex. B at 5:32:25.)

Liddle called the CRPD and received almost immediate confirmation that Defendant's driver's license was suspended. (Def. Ex. C at 5:34:16.) During the time the officers were waiting for information about Defendant's license status, Messer saw a backpack that said "Ruger" on the front passenger seat of the Grand Prix, and asked Defendant if the backpack was his. Defendant said that it was not his backpack. (Def. Ex. B at 5:34:23-25.) The backpack caught Messer's eye because Ruger is a brand of firearm, and Messer testified that if people have a backpack with the name of a firearm, that could lead to the recovery of a firearm. (Messer Hr'g Test.) The total time from Messer calling out, "Hey, Shane, come here!" to Liddle receiving confirmation that Defendant's license was suspended was approximately three minutes.

As soon as they received verification that Defendant's license was suspended, the officers arrested Defendant for driving while having a suspended license. Messer asked Defendant if he had any property in the Grand Prix, and Defendant said he believed he had a pack of cigarettes on the dashboard, but nothing else. When Messer

asked who owned the Grand Prix, Defendant said the car belonged to someone named "Chris," but that he did not know Chris's last name. Because the officers had already run the vehicle's plates, they believed Defendant was lying about who owned the car, and the officers thought the vehicle might be stolen, but not yet reported stolen. (*Id.*)

Liddle immediately conducted a search incident to arrest of Defendant's person and clothing and found a knife, a lighter, and a cigarette package containing both a baggie of methamphetamine and a chewing tobacco tin containing three more baggies of methamphetamine.

As Liddle searched Defendant's person, Messer began a search of the Grand Prix. Messer first searched the backpack, which contained a box of ammunition, two syringes, cell phones, and two identification cards. When Messer found the ammunition, he asked Defendant, who was still being searched by Liddle, if he had a firearm. Defendant said, "No." Messer continued his search of the Grand Prix. While searching, he said to another officer who had arrived at the scene to assist, "We haven't found said gun yet," and "It's gotta be close, man." (Def. Ex. B at 5:36:43-47.) Messer eventually found a pink Hi-Point handgun with camo grips in the vehicle's center console.

Messer and Liddle impounded the Grand Prix pursuant to the CRPD Towing and Impounding of Vehicles policy ("CRPD policy"). The CRPD policy provides that "[a] vehicle will be towed in connection with an in-custody arrest unless the vehicle is located on the registered owner's property." (Doc. 10-2 at 2.) Moreover, if the vehicle contains "any evidentiary items or contraband, it should be towed or impounded depending upon the circumstances." (*Id.*) It also provides, in relevant part, that "a legally licensed vehicle (with proper insurance) may be released to the owner if the owner is not the arrested party." (*Id.*) In addition, all property that is to be held for evidence must be removed from a

vehicle before the vehicle is towed, and all towed vehicles must be thoroughly searched, including all interior and exterior compartments and "their contents." (*Id.* at 3.) In this case, there was no valid insurance card in the vehicle. In accordance with the CRPD policy, the vehicle was impounded for three reasons: (1) the driver had a suspended driver's license, (2) the vehicle contained illegal drugs, and (3) the vehicle had no proof of insurance. (Doc. 13.)

Defendant was taken to the Linn County Jail where he was given his *Miranda* warning and interviewed by Messer. During the interview, Defendant stated that he was attempting to get his driver's license back and admitted owning one of the bags of methamphetamine found on his person. Defendant said he would not have four bags because four bags would be considered drug dealing.

Defendant was indicted for Possession with Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. Section 841(a)(1); Possession of a Firearm during a Drug Trafficking Crime, in violation of 18 U.S.C. Section 924(c); and Possession of a Firearm by a Felon, in violation of 18 U.S.C. Section 922(g)(1). Defendant seeks to exclude evidence resulting from the December 29, 2017 searches of his person and the Grand Prix, which he contends violated his Fourth Amendment right to protection against unreasonable searches and seizures. Defendant also seeks to exclude the confession he made during his custodial interview with Officer Messer and statements he made during a June 2018 interview with CRPD Officer John O'Brien as fruits of the poisonous tree.[2]

Other relevant facts will be introduced as necessary in the following analysis.

---

[2] Defendant's counsel elicited testimony at the hearing that Defendant had been "green lit" (marked for a beating by other prisoners) at the Linn County Jail on the night of December 29, 2018, and that Messer and Liddle were caught on their body mics laughing about it. The statements do not redound to their credit, but they are not relevant to determination of whether Defendant's Fourth Amendment rights were violated.

# III. *ANALYSIS*

## A.    *The Parties' arguments.*

Defendant argues that his seizure on December 29, 2017 without a valid traffic stop or *Terry* stop was unconstitutional. Defendant asserts that Messer and Liddle followed him into the Burger King parking lot based on nothing more than an uncorroborated tip from a confidential informant who was unknown to the officers, which did not provide reasonable suspicion to stop him. In addition, Defendant takes issue with Messer's and Liddle's instantaneous show of force, which resulted in Defendant's immediate seizure and turned what should have been a consensual encounter into an encounter in which no citizen would have felt free to leave. Finally, Defendant argues that because he was illegally seized, the searches of his person and the Grand Prix and the statements he made during his interviews with Messer and O'Brien must all be suppressed.

The Government responds that based on the totality of the circumstances, Messer and Liddle were justified in stopping Defendant because they had reasonable suspicion that Defendant was involved in criminal activity. The Government argues that since Messer and Liddle had ample evidence that Defendant could be armed, they were justified in handcuffing him during the stop. The Government further argues that since the officers did not arrest Defendant and conduct a full search of Defendant's person until Liddle received confirmation that Defendant had a suspended driver's license, the methamphetamine need not be suppressed. Likewise, the Government argues that since the officers did not search the Grand Prix or interview Defendant until after they arrested him for having a suspended driver's license, the gun and ammunition found in the vehicle and any incriminating statements Defendant made during his interviews with law enforcement need not be suppressed.

**B.** *Messer and Liddle had reasonable suspicion that Defendant was likely involved in criminal activity on December 29, 2017.*

"The Fourth Amendment prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981); *Terry v. Ohio,* 392 U.S. 1, 9 (1968)) (internal quotations omitted). Nevertheless, not all interactions between law enforcement and citizens are seizures. *See United States v. Barry*, 394 F.3d 1070, 1074 (8th Cir. 2005). A citizen who is free to ignore the police and go about his business is not "seized" for purposes of the Fourth Amendment. *United States v. Cook,* 842 F.3d 597, 600 (8th Cir. 2016) (citations omitted). A person is seized only when officers by means of physical force or some show of authority in some way restrain a citizen's liberty. *Id.* Accordingly, even when officers have no basis for suspecting a particular individual of criminal activity, they may ask the individual questions and request to see identification. *United States v. Stewart,* 631 F.3d 453, 456 (8th Cir. 2011) (citation omitted).

Officers may only conduct investigatory stops if they have reasonable suspicion that "criminal activity may be afoot." *Arvizu,* 534 U.S. at 273; *United States v. Patrick,* 776 F.3d 951, 954 (8th Cir. 2015). Reasonable suspicion is based on the totality of the circumstances and requires a "particularized and objective basis" for suspecting legal wrongdoing before a stop can be justified. *Patrick,* 776 F.3d at 954 (quoting *Cortez,* 449 U.S. at 417).

Reasonable suspicion is based on "both the content of the information possessed by police and its degree of reliability." *Navarette v. California,* 572 U.S. 393, 397 (2014) (quoting *Alabama v. White,* 496 U.S. 325, 330 (1990)). A hunch does

not constitute reasonable suspicion to justify a stop. *Wilson v. Lamp,* 901 F.3d 981, 986 (8th Cir. 2018) (citing *Terry,* 392 U.S. at 27). Rather, officers must be able to articulate "some minimal, objective justification for an investigatory stop." *United States v. Walker,* 555 F.3d 716, 719 (8th Cir. 2009) (quoting *United States v. Fuse,* 391 F.3d 924, 929 (8th Cir. 2004)).

### i. *The officers' reliance on the memo was reasonable.*

Defendant argues that any suspicion based on the memo was unreasonable because there were no indicia of credibility regarding the information contained in the memo. Defendant correctly asserts that Nusbaum did not inform members of the CRPD that his CI had a history of providing good information or how long Nusbaum had been working with the CI. Therefore, for purposes of this discussion, I will assume the CI's record is unproven.

A confidential informant's tip may support reasonable suspicion if it has sufficient indicia of reliability. *United States v. Hill,* 91 F.3d 1064, 1069 (8th Cir. 1996) (citation omitted). "Though less reliable than informants with a proven record, unproven informants are more reliable than anonymous tipsters because the police can hold them responsible for false information." *United States v. Kent,* 531 F.3d 642, 648-49 (8th Cir. 2008) (citing *Florida v. J.L.,* 529 U.S. 266, 270 (2000)). Notwithstanding the above, in rare instances, even an anonymous tip can provide sufficient indicia of reliability to provide reasonable suspicion for an investigatory stop. *Navarette,* 572 U.S. at 397. Some indicators of an informant's reliability are

- eyewitness knowledge of facts, *Id.* at 399;
- predictions of future behavior, *Id.* at 398; *United States v. Manes,* 603 F.3d 451, 456 (8th Cir. 2010);
- detailed descriptions of alleged wrongdoing, *Navarette,* 572 U.S. at 398;
- a track record as a reliable source of information, *Manes,* 603 F.3d at 456;

- independent corroboration of facts, such as identity, *Id.; Navarette,* 572 U.S. at 398; and
- contemporaneous reporting of events, such as calling 911 immediately upon viewing criminal behavior. *See Navarette,* 572 U.S. at 398-400 (internal citations omitted).

I find that the memo provided sufficient indicia of reliability so that Messer's and Liddle's reliance on it was reasonable. First, the memo stated that the CI "saw [Defendant] in possession of the gun on 12/27/2017," which meant that the CI had eyewitness knowledge of the facts. Second, the memo said the gun was "a pink Glock with camo grips" and informed officers that "Lagrange has been staying at hotels on 33rd Ave SW." These are detailed descriptions of the alleged wrongdoing. Messer testified that the description of the gun was much more detailed than the descriptions usually included in these memoranda. In addition, although not as contemporaneous as calling 911 immediately upon observing criminal behavior, the CI informed Nusbaum of Defendant's gun possession on approximately the morning of December 29, 2017, which meant that the information was not stale. *See Navarette,* 572 U.S. at 399-400 (discussing the veracity of anonymous 911 calls). Finally, Messer and Liddle corroborated facts from the memo, either from their prior knowledge or that they ascertained that day. Messer knew Defendant was a methamphetamine user before he read the memo and he recognized Defendant through the window of the Grand Prix based on his previous interactions with Defendant. Both Liddle and Messer knew that the area mentioned in the memo was a high-crime area known for gun activity; and, importantly, Defendant was found in the area where the CI said Defendant was staying.

This tip contrasts starkly with the tip in *Florida v. J.L.* in which police officers conducted a pat search of a fifteen-year-old boy based solely on a tip from an anonymous caller that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. In holding that the tip did not provide reasonable

suspicion for the police to pat search the boy, the Court reasoned that the police relied on a tip from an "unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information" about the boy. *Id.* at 271. Here, the memo explained that the CI knew about the gun from personal observation and that the CI was responsible to Officer Nusbaum. In addition, the CI's knowledge about where Defendant was staying indicated at least some inside knowledge of Defendant's activities.

The instant tip is similar to the tip in *United States v. Smith* where, in an attempt to bargain herself out of an arrest, a woman told an arresting officer that the driver of a car elsewhere at the scene had drugs and a gun. 645 F.3d 998, 1001 (8th Cir. 2011). When the officer spoke to the driver about the circumstances surrounding the woman's arrest, the officer learned the driver was on parole for a drug felony. *Id.* The court held that after learning that, the officer had reasonable articulable suspicion for an investigatory stop of the driver because the woman, who was a "known, but unproven informant," told the officer that the driver had drugs and a gun in his car, and the information was partly verified by the driver's admission that he was a convicted drug felon. *Id.* at 1002. The facts here are similar. The CI was known to Nusbaum, and for purposes of this analysis, was unproven like the CI in *Smith*. Like the information in *Smith,* the CI's information was partially verified with information related to Defendant's drug use and location. In the instant case, the location where Defendant and his gun were predicted to be found is also telling. The hotel neighborhood is a high-crime area that Messer and Liddle are assigned to specifically because it has a problem with gun crime. Part of the value of the CI's tip was that it alerted the officers that if they encountered Defendant, he might be dangerous, which warned them to approach with caution.

Therefore, Messer's and Liddle's reliance on the memo was reasonable. Moreover, the officers did not rely on the memo, alone, to provide the reasonable suspicion necessary to allow them to believe criminal activity was afoot. If they had, they would not have looked for the warrant or waited for proof that Defendant was driving while his license was under suspension before searching the Grand Prix and Defendant's person.

### ii. *Messer's reliance on his past experiences with Defendant and his belief that Defendant had an outstanding warrant were reasonable.*

An officer is not required to have confirmation that someone is violating the law before conducting a brief investigatory stop. *United States v. Smart,* 393 F.3d 767, 770 (8th Cir. 2005) (officer had reasonable suspicion to stop car "based on an imperfect and incomplete observation" that driver might be violating law requiring Iowa cars to have two license plates when car had only one plate and officer could not discern what state plate was from). Suspicion of driving with a suspended license can provide reasonable suspicion for an investigatory stop. *See United States v. Caldwell,* 97 F.3d 1063, 1067 (8th Cir. 1996) (holding that officer had reasonable suspicion when fellow officer informed him that defendant's driver's license was probably suspended).

Based on previous experience with Defendant over the course of two years, Messer believed that Defendant was driving with a suspended license. Messer testified that every time he had encountered Defendant in the past, Defendant's driver's license was suspended, and he knew Defendant had been arrested for having a suspended license. Messer need not be certain Defendant was violating Iowa traffic laws before conducting a legal investigatory stop. Suspicion that Defendant might be violating the law was enough to justify a brief stop. As discussed below, Messer and Liddle did not arrest Defendant and search him or the Grand Prix until they had confirmation that his license was suspended. Accordingly, this reliance on Messer's belief that Defendant's license

was probably suspended was reasonable, and based on this belief, alone, the officers were allowed to conduct a brief investigatory stop.

In addition, Messer believed there was an active arrest warrant for Defendant. Messer was mistaken about this fact because there was no such warrant outstanding. A reasonable mistake of fact, however, can support an investigatory stop. *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014); *Williams v. Decker,* 767 F.3d 734, 740 (8th Cir. 2014) (citation omitted); *Smart,* 393 F.3d at 770 (discussing the difference between a mistake of law and mistake of fact). "To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection." *Heien*, 135 S. Ct. at 536 (internal quotation marks and citation omitted).

The exclusionary rule applies only where it will result "in appreciable deterrence" to future violators of Fourth Amendment rights. *Herring v. United States*, 555 U.S. 135, 141, 147 (2009) (holding that items seized in search incident to arrest based on arrest warrant later found to have been expired need not be suppressed because punishing mere negligent record keeping, rather than "systematic error" or "reckless disregard for constitutional requirements" did not serve purposes of exclusionary rule); *United States v. Szczerba*, 897 F.3d 929, 937 (8th Cir. 2018). Accordingly, an officer's mistake of fact will only result in suppression if the mistake amounted to a "flagrant or deliberate violation of rights." *Herring,* 555 U.S. at 143 (quotation omitted).

In this case, the Court finds that Messer's belief that Defendant had an outstanding warrant was reasonable. Messer testified that based on the subject line of the memo, "Burglary/Wanted Subject/Officer Safety Information," he thought Defendant had an outstanding warrant because of the words "Wanted Subject." Messer's body cam video shows Messer looking through the warrant screen on his mobile phone while he and Liddle are awaiting confirmation on Defendant's license

suspension. This demonstrates that Messer expected to find the warrant in the warrant database. (Def. Ex. B at 5:33:20-39.) In addition, when Defendant asked the officers why he was being stopped, Messer told Defendant he had warrant paperwork to do. (*Id.* at 5:32:16-17.) I find that Messer's conclusion that Defendant had an outstanding warrant was a mistake of fact. I further find that Messer's mistake was reasonable under the circumstances and did not demonstrate a reckless disregard for constitutional requirements. Messer and Liddle could, therefore, rely on Messer's belief that Defendant had an open warrant when they saw him on December 29.

### iii. *Messer and Liddle had reasonable suspicion that Defendant was likely involved in criminal activity.*

Even if none of the above-discussed facts by itself provided the officers with reasonable, articulable suspicion that Defendant was engaged in criminal activity, I find the totality of the circumstances adequately supported such suspicion. *See Patrick,* 776 F.3d at 954. By the time Messer identified Defendant as the driver of the Grand Prix, the officers believed the following information to be true: (1) Defendant was a known drug user, which may have made it illegal for him to possess weapons; (2) Defendant had been seen within the past 48 hours with a gun by a CI with an unknown track record, but with some indicia of credibility; (3) it was likely Defendant was driving with a suspended license; (4) Defendant had previously been arrested for driving with a suspended license; (5) Defendant did not own the car he was driving; (6) Defendant was currently in, and was reportedly staying in, a high-crime area known for drug and gun violence; and (7) although mistaken, the officers believed Defendant was the subject of an active warrant. When taken together, this information gave the officers reasonable suspicion to conduct an investigative stop of Defendant. *See United States v. Garcia,* 441 F.3d 596, 599 (8th Cir. 2006) (holding

that officer was justified in concluding that criminal activity might be afoot when defendant had drug conviction, did not own car he was driving, and was driving with revoked license); *see also Smart,* 393 F.3d at 770. The officers' knowledge that Defendant was likely driving with a suspended license, alone, was enough to create reasonable suspicion. *See id; Caldwell,* 97 F.3d at 1067.

**C.      *The items seized in the searches of Defendant and the Grand Prix should not be suppressed.***

**i.      *Defendant was merely detained before his arrest.***

Before reaching the issue of the searches, I will briefly address Defendant's pre-arrest status. Defendant argues that he was immediately seized, rather than merely detained, prior to being arrested, because no reasonable person would have felt free to leave the scene with two officers shouting at him and immediately handcuffing him while he was complying with the officers' instructions.

Although Messer testified that he parked far enough away so that Defendant could drive out or back out, and that the officers wanted to show their initial contact with Defendant was intended to be consensual and not custodial (Messer Hr'g Test.), Defendant was handcuffed as soon as officers were close to Defendant. Defendant argues this does not indicate a mere detainment, but rather a seizure.

During an investigative stop, officers should use "the least intrusive means of detention and investigation reasonably necessary to achieve the purpose of the detention." *United States v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (citation omitted). If officers use unreasonable force, an investigative stop can turn into an arrest. *Id.* Officers may, however, handcuff subjects and place them in squad cars during investigative stops to protect their safety and "maintain the status quo." *Smith,* 645 F.3d at 1002; *Martinez,* 462 F.3d at 907 (holding that handcuffing bank robbery suspect during *Terry*

stop was a reasonable response when robber had used a gun and suspect was found near scene acting suspiciously).

I find that although the officers intended to leave Defendant room to exit their consensual conversation, it was reasonable that the officers' approach to Defendant changed once they thought Defendant might have a gun in his waistband. *See United States v. Fisher,* 364 F.3d 970, 973 (8th Cir. 2004) (reasoning that past non-violent encounter with defendant did not negate new information that defendant was likely armed and, therefore officers' use of weapons during *Terry* stop was justified). Once the officers suspected Defendant was armed outside the vehicle, they were justified in securing him during his detainment. This action did not turn the investigative stop into an arrest. *See Martinez,* 462 F.3d at 907.

Moreover, "when an informant is shown to be right about some things, he is probably right about other facts that he has alleged." *Manes*, 603 F.3d at 456 (quoting *White,* 496 U.S. at 331). At this point, the officers knew the CI had been right about Defendant's general location, which gave them reason to believe that the CI's tip that Defendant had a gun might also be credible. They reasonably concluded this called for heightened caution dealing with Defendant, and Messer testified that Defendant was handcuffed for officer safety. (Messer Hr'g Test.) An indication that Defendant was not seized at this juncture is Messer's insistence that Liddle not search Defendant beyond a cursory pat search. The officers were waiting for news about Defendant's license status before conducting a more invasive search of Defendant or any search of the Grand Prix.

Thus, I conclude that prior to Messer and Liddle receiving confirmation that Defendant's driver's license was suspended, Defendant was merely detained, and not seized. Only after the officers received confirmation that Defendant's driver's license was suspended, was Defendant legally arrested.

### ii. *The items seized from Defendant's person should not be suppressed.*

Defendant argues that all items seized in the search of his person must be suppressed as fruit of the poisonous tree based on an illegal arrest. However, because I have determined that Defendant's arrest was valid, Liddle had the right to search Defendant incident to that arrest. *See United States v. Robinson,* 414 U.S. 218, 226 (1973); *United States v. Pratt,* 355 F.3d 1119, 1121 (8th Cir. 2004). Although no further justification was needed, Defendant's admission that he had a knife on his person that Liddle did not find during his pat search provided Liddle with another reason to conduct a thorough search of Defendant's person after arresting him. *See Pratt,* 335 F.3d. at 1121 (reasoning that a search incident to arrest is justified, in part, by concerns for officer safety) (citing *Robinson,* 414 U.S. at 234). Thus, the methamphetamine seized from Defendant's person during Liddle's search incident to arrest need not be suppressed.

### iii. *The items seized from the search of the Grand Prix should not be suppressed.*

Defendant argues that the gun seized in the search of the Grand Prix must also be suppressed as fruit of the poisonous tree. In addition, Defendant argues that per the CRPD's Towing and Impounding of Vehicles Policy, Liddle and Messer could have released the car to the owner, but instead chose to impound it because they wanted to search for the gun they did not find in their pat search of Defendant.

The Government counters that Messer was entitled to search the Grand Prix as an inventory search and pursuant to the abandonment doctrine. In addition, the Government asserts that even if Messer's search of the Grand Prix was unconstitutional, the inevitable discovery doctrine applies to the gun, and therefore the gun need not be suppressed on that basis, also.

### a.     *The search of the Grand Prix was a valid inventory search.*

Defendant asserts that after Liddle and Messer arrested Defendant, they could have released the Grand Prix to its owner if they wanted to, but instead they kept the car because they wanted to search for the firearm they did not find on Defendant's person.

Police officers are given discretion regarding how to handle automobile impoundment after an arrest, as long as that discretion is exercised "according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *United States v. Betterton,* 417 F.3d 826, 830 (8th Cir. 2005) (quotation omitted).  In addition, to be constitutional, a warrantless inventory search of a vehicle must be done pursuant to a police department's standard procedures and for the purpose of protecting the car and its contents. *Id.* (citations omitted). Inventory searches "protect the police against claims of lost or stolen property[] and protect the police from potential danger." *United States v. Hartje,* 251 F.3d 771, 775 (8th Cir. 2001) (citation omitted).  While conducting inventory searches, officers are permitted to "keep their eyes open for potentially incriminating items." *United States v. Beal,* 430 F.3d 950, 954 (8th Cir. 2005) (quoting *United States v. Marshall,* 986 F.2d 1171, 1174 (8th Cir.1993)). When department procedures require that officers impound a vehicle, officers cannot release it even to the non-arrested owner. *Id.*

Presumably, Defendant argues that the Grand Prix should have been released to its owner because if the vehicle was released to the owner, it would never have been searched.  Although CRPD policy provides that a vehicle "may be released to the owner if the owner is not the arrested party" (Doc. 10-2 at 2), CRPD policy also provides that "a vehicle will be towed in connection with an in-custody arrest." (*Id.*)

This case is similar to *Beal*, in which a driver arrested for having a suspended license sought suppression of evidence seized during an inventory search because the

car's owner came to claim the car before CRPD officers towed the car. 430 F.3d at 952. The court held that because the car was impounded pursuant to CRPD inventory policies, officers were not required to release it to the owner. *Id.* at 954. Like the officers in *Beal,* Liddle and Messer were required to impound the Grand Prix because it was involved in a crime and contained evidence of contraband. Therefore, the officers were not required to contact the owner, and had to impound the vehicle.

Furthermore, CRPD policy provides that all property that is to be held for evidence must be removed from a vehicle before the vehicle is towed, and that all towed vehicles must be thoroughly searched, including all interior and exterior compartments and "their contents." (Doc. 10-2 at 3.) Messer followed this policy when he conducted an inventory search of the Grand Prix. During this search, he was not required to ignore potentially incriminating items or his knowledge of Defendant, such as Defendant's drug history and suspected possession of a firearm, which was heightened because of the presence of a backpack emblazoned with the word "Ruger."

Therefore, I find that Messer conducted a valid inventory search in compliance with CRPD policy, and the evidence need not be suppressed because of this search.

      **b.**      ***Defendant had not abandoned the Grand Prix or property in it.***

The Government argues that because Defendant denied that the Grand Prix was his and denied that he had anything in the vehicle besides a pack of cigarettes on the dashboard, he abandoned his right to challenge the search of the vehicle.

Under the abandonment doctrine, a defendant forfeits his reasonable expectation of privacy in property he abandons. *United States v. Crumble,* 878 F.3d 656, 659 (8th Cir. 2018). A finding of abandonment depends on the totality of the circumstances, with "two important factors being denial of ownership and physical relinquishment of the property." *United States v. Tugwell,* 125 F.3d 600, 602 (8th

Cir. 1997). A defendant abandons a vehicle when he leaves it unattended and walks away from it. *See e.g., United States v. Smith,* 648 F.3d 654, 660 (8th Cir. 2011).

Although Messer testified that he and Liddle thought Defendant could "potentially be running" when they first encountered him because Defendant "sidestepped" out of the car and faced away from the officers as if he was trying to hide his face, my review of the video evidence does not support this conclusion. It appears to me that Defendant exited the car and was merely looking down at his feet or ahead of him when he exited the Grand Prix. (Def. Ex. A at 5:31:10.) I do not interpret any of Defendant's actions as moves meant to hide his face simply because he was not looking back toward the officers.

There is no indication that Defendant intended to flee or relinquish the Grand Prix. (*Id.*) In its pre-hearing brief, the Government stated that it expected evidence at the hearing to show that "Defendant demonstrated relinquishment of the vehicle before being stopped by police, in a public parking lot, unoccupied, unlocked, with the key still in the vehicle, and the vehicle running." (Doc. 10 at 10.)

I find that the evidence adduced at the hearing does not support this conclusion. First, no evidence was introduced at the hearing regarding Defendant's motivation for pulling into the Burger King lot and parking the Grand Prix that night. Second, there is no evidence that Defendant intended to flee and leave the vehicle behind. Accordingly, this case is distinguishable from *Smith,* 648 F.3d at 660*; United States v. Vasquez,* 635 F.3d 889 (7th Cir. 2011); and *United States v. Tate,* 821 F.2d 1328 (8th Cir. 1987), all cases cited by the Government, and all cases in which the defendants left vehicles and ran away from law enforcement on foot. *See Smith,* 648 F.3d at 659 (vehicle abandoned when left unlocked and running with keys in the ignition in public place as defendant was fleeing police); *Vasquez,* 635 F.3d at 894 (calling motion to suppress items seized in search of car a "dead-bang loser," in part

because car was abandoned when the defendant "ditched it and bolted off on the run"); *Tate,* 821 F.2d at 1330 (van abandoned when defendant left it unoccupied and unlocked as he fled murder scene). Rather, the video evidence shows Defendant exiting the vehicle and allowing the door to close on its own as he puts his hands in the air in response to Messer's instructions. (Def. Ex. A at 5:31:04-08.) Defendant never turned as if he was preparing to run away. (*Id.*) Therefore, I find that Defendant did not abandon or relinquish the Grand Prix by trying to flee. As such, abandonment is not a reason to deny Defendant's motion.

### c. *The evidence in the Grand Prix would not have been inevitably discovered.*

The Government argues that even if Messer's search of the Grand Prix violated Defendant's constitutional rights, the evidence in the vehicle would have been discovered during the inventory search conducted at the CRPD impound lot. The inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without an unconstitutional violation. *Utah v. Strief,* 136 S. Ct. 2056, 2061 (2016) (citing *Nix v. Williams,* 467 U.S. 431, 443-44 (1984)); *Hogan v. Kelley,* 826 F.3d 1025, 1028 (8th Cir. 2016), *cert. denied,* 138 S. Ct. 635 (2018). For the inevitable discovery doctrine to apply, the Government must prove not only that the evidence would have been discovered by lawful means, but also that the officers were "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *Id.* (citing *United States v. McManaman,* 673 F.3d 841, 846 (8th Cir. 2012)). In *McManaman,* the Eighth Circuit held that child pornography seized in a search of defendant's home need not be suppressed because drug paraphernalia found on the defendant's person when he was arrested would have given officers enough probable cause to get a search warrant that would have ultimately led to the discovery of the pornography. 673 F.3d at 847-48.

I find that if Messer's search of the Grand Prix was unconstitutional, discovery of the evidence in the vehicle was not inevitable as an inventory search of an impounded vehicle. Messer's search of the vehicle would be unconstitutional if Messer and Liddle did not have reasonable suspicion to conduct an investigative stop of Defendant. There was no evidence of an alternative line of investigation that would have led to a constitutional search of the vehicle. Under the facts of this case, any search of the Grand Prix would have been tied to the initial stop of Defendant. Accordingly, I find that if Messer's search of the Grand Prix had been unconstitutional, the evidence in the vehicle would not have been found through inevitable discovery.

### d. *Items seized from the search of the Grand Prix need not be suppressed.*

Based on the above analysis, evidence seized from the search of the Grand Prix need not be suppressed because the evidence was discovered during Messer's lawful inventory search of the vehicle pursuant to CRPD policy.

**D.** **Defendant's statements should not be suppressed.**

### i. *Defendant's December 29, 2017 confession should not be suppressed.*

Defendant argues that his confession was the fruit of the poisonous tree because his arrest was unconstitutional.

I have already found that Defendant's arrest was not unconstitutional. Although Defendant did not have an attorney present when he spoke to Messer on the night he was arrested, he was read his *Miranda* rights and indicated he understood them because Defendant read the rights sheet back to Messer and then signed it. (Messer Hr'g Test.) Moreover, Defendant makes no argument that his *Miranda* rights were violated or that his right to counsel was violated on December 29, 2017.

With no evidence of a constitutional violation related to Defendant's December 29, 2017 confession, I find that the confession need not be suppressed.

### ii. *Defendant's June 2018 statements should not be suppressed.*

Defendant also made statements to CRPD police officer John O'Brien in June 2018. Although the Government anticipated that these statements would be at issue, little evidence related to these later statements was presented at the hearing. O'Brien responded to questions about his June 2018 interview with Defendant in the following way:

> Q. Do you recall if you would have Mirandized him at the time?
> A. I did.
>
> . . .
>
> Q. Was the defendant cuffed at the time?
> A. No.
>
> . . .
>
> Q. Did you discuss the gun that was found in the vehicle from December twenty-ninth of 2017?
> A. Yes.
> Q. And did you discuss Mr. LaGrange's drug usage?
> A. Yes.
> Q. How did the interview end?
> A. Mr. LaGrange expressed interest in wanting to help himself and provide information that he had. He was concerned with his previous conviction for perjury.
>
> . . .
>
> Q. Anything else we should know regarding your interview of the Defendant?
> A. No.

(John O'Brien Nov. 5, 2018 Hr'g Test.)

It is unclear how the statements described by Officer O'Brien as having occurred in June 2018 may be relevant to the Government's case. Nevertheless, for the reasons set forth above, I believe there was no unconstitutional search and seizure of the

Defendant that would warrant exclusion of these statements as fruit of the poisonous tree. Nor do I find there was a violation of Defendant's *Miranda* rights at the time of the June 2018 interview. Regardless, I find that the interview of Defendant in June 2018 is so attenuated that such statements need not be suppressed, even if Defendant's rights were violated on December 29, 2017.

To determine whether the statements made to Officer O'Brien are sufficiently attenuated to prevent them from being suppressed, I first must determine whether there is a factual nexus between the constitutional violation and the challenged evidence. *United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2016), *cert. denied,* 138 S. Ct. 89 (2017). In this case, the evidence supports the factual nexus between the alleged constitutional violation (i.e., the allegedly unconstitutional stop and accompanying searches) and Defendant's statements several months later. The only evidence offered at the hearing on this particular issue is that Defendant was in custody because of the events of December 29, 2017 and that the purpose of Officer O'Brien's interview was to discuss those events.

In *Brown v. Illinois*, the Court held that to determine whether the causal connection between incriminating statements and an arrest or search that violated the Fourth Amendment has been broken, courts should consider four factors: (1) whether a defendant had been given *Miranda* warnings, (2) the "temporal proximity" of the unconstitutional conduct and the statements, (3) the "presence of intervening circumstances," and (4) "the purpose and flagrancy of the official misconduct." 422 U.S. 590, 603-04 (1975) (citations omitted).

Defendant was given *Miranda* warnings on at least two occasions: when he was interviewed on the night he was initially arrested and before Officer O'Brien's subsequent interview. This factor weighs in favor of attenuation. The provision of *Miranda*

warnings is important, but not dispositive under *Brown* and *Yorgensen*. *See id.*; *Yorgensen*, 845 F.3d at 914.

The June 2018 interview was not temporally close to the allegedly unconstitutional conduct because almost six months had passed. This gave Defendant "plenty of time to contemplate his situation and reconsider his decision to confess." *Yorgensen*, 845 F.3d at 914 (holding that two-day period between defendant's arrest and interview weighed in favor of attenuation when defendant spent the two days in custody because of "substantial evidence" of drug trafficking against him); *accord United States v. Vega–Rico*, 417 F.3d 976, 980 (8th Cir. 2005) (four days between alleged violation and defendant's statement supported finding of attenuation). This factor weighs in favor of attenuation.

The *Yorgensen* court considered the fact that a defendant's custodial interview was undertaken by an agent who was not involved in the initial Fourth Amendment violation as evidence of intervening circumstances. *Yorgensen*, 845 F.3d at 914-15. In this case, O'Brien was assigned to investigate Defendant's case on January 12, 2018, before federal charges were filed. (O'Brien Hr'g Test.) There is no evidence of O'Brien's involvement with the alleged unconstitutional conduct on December 29, 2017. For these reasons, I find O'Brien's involvement constitutes the presence of intervening circumstances. This factor weighs in favor of attenuation.

Finally, I find that the alleged misconduct was not intentional and far from flagrant official misconduct. Although I disagree with Defendant's contention that the officers lacked reasonable suspicion for the stop, arrest, and search, at the very worst, Liddle and Messer were premature in their determination of suspicion based on Defendant driving under suspension and negligent in their mistaken impression that Defendant was the subject of an open warrant. This factor, too, weighs in favor of attenuation.

As such, I find that all factors weigh in favor of finding the June 2018 statements are sufficiently attenuated from the alleged unconstitutional conduct. In other words, if

this Court declines to follow my recommendation regarding the constitutionality of the officers' conduct in December 2017, I recommend the Court find the statements from the June 2018 interview are sufficiently attenuated from that conduct that they should not be suppressed.

## IV. *CONCLUSION*

Based on the above, I find that Defendant's Fourth Amendment rights were not violated on December 29, 2017 or in June 2018.

**Therefore, I respectfully recommend that Defendant's Motion to Suppress (Doc. 7) be DENIED.**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 28th day of November, 2018.

_____
Mark A. Roberts
United States Magistrate Judge
Northern District of Iowa